# RECORD IMPOUNDED

**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. <u>R.</u> 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-0137-23

C.T.,

    Plaintiff-Respondent,

v.

G.T.,

    Defendant-Appellant.

_____

Submitted May 28, 2024 – Decided July 5, 2024

Before Judges DeAlmeida and Bishop-Thompson.

On appeal from the Superior Court of New Jersey, Chancery Division, Family Part, Atlantic County, Docket No. FV-01-0126-24.

Klineburger and Nussey, attorneys for appellant (D. Ryan Nussey and Lisa G. Nolan, on the brief).

Respondent has not filed a brief.

PER CURIAM

Defendant G.T.[1] appeals from an August 2, 2023 final restraining order (FRO) entered against him in the Family Part pursuant to the Prevention of Domestic Violence Act (the Act), N.J.S.A. 2C:25-17 to -35. We vacate the FRO and remand for further findings of fact and conclusions of law by the trial court.

I.

The following facts are derived from the record. In 2022, the parties were divorced after nearly twenty-seven years of marriage. They have four adult children who live with plaintiff C.T. in Philadelphia. G.T. resides nearby.

On July 24, 2023, about seven months after the divorce, C.T. obtained a temporary restraining order (TRO) against G.T. The TRO alleged harassment and terroristic threats against by G.T. against C.T. on the prior day, as well as prior acts of domestic violence.

At a subsequent trial, C.T. testified that on July 23, 2023, she was at a beach bar in Atlantic County, where she was vacationing. She was with a man that she was dating and other friends. C.T. testified that G.T., who was also vacationing nearby, "came out of nowhere with no warning and started snapping pictures of me and my friends." C.T. testified that G.T. "yelled at me, are you

---

[1] We use initials to preserve the confidentiality of court records concerning domestic violence. R. 1:38-3(d)(9).

A-0137-23

with him" before she tried to introduce her male companion to G.T. in the hope of deescalating the situation. According to C.T.'s testimony, G.T.

> didn't want to hear that and he started to say things to my friends like what are you doing, who are you, I'm going to knock your teeth down your throat, telling me he was going to drag me out by my hair, told me do not come back, he will be there every Sunday from now on to see if I'm there and don't go out at night because he'll be there waiting.

C.T. testified that G.T. then sent texts to their children, copying C.T., "saying that I was a whore, that I hang out with whores and that this is the ugly guy that I'm sleeping with and seeing, and this is where I should be worried about staying home for my adult children, putting food on the table instead of being out with men." The trial court reviewed the contents of the text messages.[2]

C.T. testified that in 2022, G.T. went to her place of employment when she was not there and "caused a scene." She also testified that G.T. had harassed her "whenever he thinks I'm out with a male or with friends or drinking or having fun." She continued, "[h]is friends videotaped me in Philadelphia's Live Casino a couple months ago and sent it to him because I was with another male. It's

---

[2] Although portions of the text messages were marked as an exhibit, the exhibit was not moved into evidence, and the contents of the text messages were not read into the record. G.T. did not include a copy of the text messages in his appendix. We are, therefore, unable to review the exact content of the messages.

3

like I – I'm constantly looking over my shoulder." During cross-examination, C.T. expounded on G.T.'s prior behavior:

> If he hears from another party that I may be with a man or out with friends that he does not approve of, he (indiscernible). I get phone calls, I get told he's on his way there. This is his place. I shouldn't be there. I'm on my way. And I've had to leave the casino before from a phone call that he heard I was there and he was on his way.

C.T. described two incidents that occurred four years earlier when they were separated. On one occasion, G.T. grabbed her throat while in her home during an argument. On another occasion, G.T. refused to allow her to leave his car.

C.T. testified that she does not feel safe without a restraining order. She testified that "I have to be able to have a life and I have to be able to be out in public without him showing up and threatening everyone I'm with, including myself." According to C.T., G.T. "broke the [TRO] two times within five minutes of being served and had berated my two adult daughters to get me to drop the restraining order or they didn't love him. [T]he harassment is just so out of control . . . ." She continued, "I need some type of protection from him. I don't trust him. I think he can show up whenever he wants if he gets angry enough and I don't know what he will do. I don't trust that he wouldn't hurt me. He's done it already."

A-0137-23

During his testimony, G.T. admitted he saw C.T. with another man at the beach bar on the night in question. He admitted that he approached the two, "had words with them" and that his conduct was inappropriate. G.T. also admitted that after the incident at the bar, he sent text messages about C.T. to a group chat that included C.T. and their four children. G.T. conceded that the contents of those messages were inappropriate. He also admitted after the incident, he sent C.T. a text message in which he admitted that his conduct on the night in question was inappropriate and apologized for "overreacting" when he saw her with another man for the first time.

At the conclusion of the trial, the court issued an oral opinion granting the FRO. The court found that G.T.'s admissions corroborated C.T.'s credible account of what transpired at the beach bar. The court found that G.T. confronted C.T. and her male companion and used course and offensive language. In addition, the court found that its review of the text messages, along with G.T.'s testimony, corroborated C.T.'s testimony regarding the contents of the messages.

The court found that C.T. proved that G.T. committed the predicate act of harassment, N.J.S.A. 2C:33-4. The court found that G.T. made one or more communications in offensively course language or a manner likely to cause C.T.

A-0137-23

annoyance or alarm. In support of this conclusion, the court relied on both what G.T. said to C.T. and her companion in the bar and on the text messages he sent to C.T. and her children. The court did not make an explicit finding that G.T. issued those communications with the purpose to harass C.T.[3]

The court then undertook an analysis of the six factors set forth in N.J.S.A. 2C:25-29(a)(1) to (6), to determine if entry of an FRO was warranted. The court accepted as credible C.T.'s testimony regarding prior acts of domestic violence, including prior harassing text messages from G.T. The court also found the existence of immediate danger to C.T., given G.T.'s behavior at the beach bar, the text messages he sent that night, and C.T.'s credible testimony regarding his prior behavior. The court found that it would be in C.T.'s best interests for an FRO to be in place. The court found that the financial circumstances of the parties and their adult children were not relevant to the analysis. Finally, the court found that no evidence was presented of a restraining order having been entered against G.T. in any other jurisdiction.

After weighing those factors, the court concluded that entry of an FRO was "necessary to ensure that [C.T.'s] life, health or well-being, ensure that she

---

[3] The court found that C.T. did not establish that G.T. committed the predicate act of terroristic threats, N.J.S.A. 2C:12-3(a) and (b).

6

is not in danger."  An August 2, 2023 FRO memorializes the trial court's decision.

This appeal followed.  G.T. raises the following arguments.

> IT WAS REVERSIBLE ERROR TO FIND THAT [G.T.] COMMITTED THE PREDICATE ACT OF HARASSMENT UNDER THE PREVENTION OF DOMESTIC VIOLENCE ACT.
>
> A.    IT WAS ERROR TO FIND THE PREDICATE OFFENSE OF HARASSMENT WITHOUT ANY FINDING OF PURPOSE OR INTENT TO HARASS.
>
> B.    THE LOWER COURT ERRED IN FINDING DOMESTIC VIOLENCE AS OPPOSED TO ORDINARY DOMESTIC CONTRETEMPS.

## II.

"In our review of a trial court's order entered following trial in a domestic violence matter, we grant substantial deference to the trial court's findings of fact and legal conclusions based upon those findings."  D.N. v. K.M., 429 N.J. Super. 592, 596 (App. Div. 2013) (citing Cesare v. Cesare, 154 N.J. 394, 411-12 (1998)).  We should not disturb the "'factual findings and legal conclusions of the trial judge unless [we are] convinced that they are so manifestly unsupported by or inconsistent with the competent, relevant and reasonably credible evidence as to offend the interests of justice.'"  Cesare, 154 N.J. at 412 (quoting Rova Farms Resort, Inc. v. Inv'rs Ins. Co., 65 N.J. 474, 484 (1974)).

7

Deference is particularly appropriate when the evidence is testimonial and involves credibility issues because the judge who observes the witnesses and hears the testimony has a perspective the reviewing court does not enjoy. Pascale v. Pascale, 113 N.J. 20, 33 (1988) (citing Gallo v. Gallo, 66 N.J. Super. 1, 5 (App. Div. 1961)).

The entry of an FRO requires the trial court to make certain findings. See Silver v. Silver, 387 N.J. Super. 112, 125-27 (App. Div. 2006). The court "must determine whether the plaintiff has proven, by a preponderance of the credible evidence, that one or more of the predicate acts set forth in N.J.S.A. 2C:25-19[(a)] has occurred." Id. at 125. The court should make this determination "'in light of the previous history of violence between the parties.'" Ibid. (quoting Cesare, 154 N.J. at 402).

Next, the court must determine "whether a restraining order is necessary, upon an evaluation of the factors set forth in N.J.S.A. 2C:25-29[(a)](1) to -29[(a)](6), to protect the victim from an immediate danger or to prevent further abuse." Id. at 127 (citing N.J.S.A. 2C:25-29(b)); see also J.D. v. M.D.F., 207 N.J. 458, 475-76 (2011). This determination requires evaluation of:

> (1)   The previous history of domestic violence between the plaintiff and defendant, including threats, harassment and physical abuse;

(2)    The existence of immediate danger to person or property;

(3)    The financial circumstances of the plaintiff and defendant;

(4)    The best interest of the victim and any child;

(5)    In determining custody and parenting time the protection of the victim's safety; and

(6)    The existence of a verifiable order of protection from another jurisdiction.

[N.J.S.A. 2C:25-29(a); see also Cesare, 154 N.J. at 401.]

Here, the trial court determined that G.T. committed harassment, one of the predicate acts set forth in the Act.  N.J.S.A. 2C:25-19(a)(13).  A person commits harassment if, "with purpose to harass another," he or she:

(a)    Makes, or causes to be made, one or more communications or communications anonymously or at extremely inconvenient hours, or in offensively coarse language, or any other manner likely to cause annoyance or alarm;

(b)    Subjects another to striking, kicking, shoving, or other offensive touching, or threatens to do so; or

(c)    Engages in any other course of alarming conduct or of repeatedly committed acts with purpose to alarm or seriously annoy such other person.

[N.J.S.A. 2C:33-4.]

For a finding of harassment under N.J.S.A. 2C:33-4, the actor must have the purpose to harass. Corrente v. Corrente, 281 N.J. Super. 243, 249 (App. Div. 1995) (citing D.C. v. T.H., 269 N.J. Super. 458, 461-62 (App. Div. 1994); E.K. v. G.K., 241 N.J. Super. 567, 570 (App. Div. 1990)). Finding a party had the purpose to harass must be supported by "some evidence that the actor's conscious object was to alarm or annoy; mere awareness that someone might be alarmed or annoyed is insufficient." J.D., 207 N.J. at 487 (citing State v. Fuchs, 230 N.J. Super. 420, 428 (App. Div. 1989)). A purpose to harass may be inferred from the evidence. State v. McDougald, 120 N.J. 523, 566-67 (1990). Common sense and experience may also inform a determination or finding of purpose. State v. Hoffman, 149 N.J. 564, 577 (1997) (citing State v. Richards, 155 N.J. Super. 106, 118 (App. Div. 1978)). "[T]he decision about whether a particular series of events rises to the level of harassment or not is fact-sensitive." J.D., 207 N.J. at 484.

We agree that the trial court did not make a finding that G.T. acted with the purpose to harass C.T. when he confronted her and her friends at the bar and subsequently circulated text messages to C.T. and her children. In the absence of such a finding, a conclusion that G.T. committed the predicate act of harassment cannot be sustained. We, therefore, vacate the August 2, 2023 FRO.

10

Because the court did not address the question of G.T.'s purpose, we remand to permit the court to make findings of fact and conclusions of law with respect to whether, based on the record compiled at the August 2, 2023 trial, G.T. acted with the purpose to harass C.T. necessary to support a finding that he committed the predicate act of harassment. We restore the TRO, which shall remain in place until the trial court determines whether issuance of an FRO is warranted.

The August 2, 2023 FRO is vacated, the July 24, 2023 TRO is reinstated, and the matter is remanded to the trial court for further proceedings consistent with this opinion. We do not retain jurisdiction.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

11